UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re:  RUBEN R. MAYNES, JR. and                                          No. 18-11609-j7
        DONNA L. MAYNES,

        Debtors.

# MEMORANDUM OPINION

Debtors Ruben R. Maynes, Jr. and Donna L. Maynes seek to redeem a 1978 Ford F350 truck (the "Truck") subject to a lien held by State Employees Credit Union (the "Credit Union") for $1,500 payable within sixty days of the date of entry of the order authorizing redemption. *See* Debtors' Motion for Redemption of 1979[1] Ford F350 Truck ("Motion to Redeem") – Docket No. 16. The Credit Union objected to the Motion to Redeem. *See* State Employees Credit Union's Objection to Debtors' Motion for Redemption of "1979 Ford F350 Truck" ("Objection") – Docket No. 18.

The Court held a final, evidentiary hearing on the Motion to Redeem on February 7, 2019 and took the matter under advisement.[2] For the reasons explained below, the Court finds that the value of the Truck for redemption purposes is $5,000, not $1,500 as requested by the Debtors in their Motion. Accordingly, the Court will deny the Motion to Redeem, with leave for the Debtors to redeem the Truck by paying the redemption value of $5,000 to the Credit Union within 30 days of the date of entry of this Memorandum Opinion and Order and thereby to retain the Truck.

---

[1] The Motion to Redeem describes the Truck as a 1979 Ford F350. In fact, the Truck-year is 1978.
[2] With the parties' consent, the Court took judicial notice of the documents filed in the Debtors' bankruptcy case, including the Debtors' statements and schedules.

FACTS[3]

Debtors filed a voluntary petition under Chapter 7 of the Bankruptcy Code on June 26, 2018. Debtors listed the following vehicles with the following values on Schedule A/B:

| | |
|---|---|
| 1979 Ford F350 | $6,010 |
| 2001 Ford F150 | $6,010 |
| 2013 Hyundai Sonata | $4,350 |

*See* Docket No. 1. The vehicle scheduled as the 1979 Ford F350 is the 1978 Truck. On Schedule C, Debtors claimed an exemption in the Truck in the amount of $7,550. *Id.* Debtors' Schedule A/B reflects that the Truck is secured by a lien held by the Credit Union in the "approximate amount of $14,591.62" cross-collateralized with the 2001 Ford F150. *Id.* Debtors have since returned the 2001 Ford F150 to the Credit Union. Mr. Maynes testified that the identification of the Truck as a 1979 Ford F350 rather than a 1978 Ford F350 in his bankruptcy schedules was a mistake that he did not notice when he reviewed his bankruptcy schedules before signing them. He also testified that to arrive at the scheduled values he simply divided the combined value of the two trucks listed in his schedules in half because they were cross-collateralized to secure loans from the Credit Union.

The Truck was not originally manufactured as an F350. It started out as an F150, two-wheel drive truck, but was heavily modified into a custom truck with four-wheel drive.[4] The

---

[3] The Court enters its findings of fact and conclusions of law in this Memorandum Opinion in accordance with Fed. R. Bankr. P. 9014 and Fed. R. Bankr. P. 7052. To the extent the Facts section of this Memorandum Opinion includes conclusions of law, such conclusions are incorporated by reference into the Discussion, and to the extent the Discussion section of this Memorandum Opinion contains findings of fact, such findings are incorporated by reference into the Facts section.

[4] There is conflicting evidence regarding Truck's original model type. The loan agreement for Truck identifies the Truck as a Ford F250. *See* Exhibit No. 7. A subsequent loan agreement reflecting the Truck as additional security identifies the Truck as a Ford F350. *See* Exhibit 4. The repair estimate for the Truck

Debtor testified that the Truck is a "heavily modified one ton truck" with a "3/4 ton chassis." The body of the Truck is a Super Cab. Notwithstanding the Truck's origination as an F150, the exterior of the Truck now bears an F350 designation.

Debtors obtained a loan in the principal amount of $15,715.88 from the Credit Union to purchase the Truck in August of 2014. *See* Exhibit 7.[5] The Debtors obtained the Truck from Spokane, Washington. The Truck also served as collateral for another loan. *See* Exhibit No. 4. Mr. Maynes has collected these types of trucks over the years. The Truck is titled in the name of Ruben Maynes. *See* Exhibit 4. The Debtor wants to redeem the Truck because it was his son's first vehicle. The Debtor wants to give the Truck to his son who wants to fix it up when he comes home on leave from the coast guard.

The odometer on the Truck runs to 99,999 before it rolls over to begin again at zero. Because the Truck is well over thirty years old, it is difficult to estimate the Truck's mileage. The mileage reflected in the repair estimate prepared in December of 2018 is 62,997. *See* Exhibit 16. In the past when the Debtor lived in Pecos, New Mexico, the Debtor used the Truck for hauling wood and for camping. At the time Debtor filed his bankruptcy petition, the Truck was not operating. A repair estimate for the Truck prepared by San Tan Ford in Gilbert, Arizona in December of 2018 recommends repairs that would cost an estimated $1,746.50. *See* Exhibit 16. In addition, in the Debtor's opinion the cam shaft in the Truck is damaged and in need of

---

identifies the Truck as a Ford F250. *See* Exhibit 16. The Debtor, who has collected many of these types of trucks over the years, testified that the Truck started out as an F150 two-wheel drive truck based on the VIN# of X15SKCC5271. *See* Exhibit 16. He explained that the "X" in the VIN# designates the body style as a Super Cab from 1977 to 1979 and that the next two numbers in the VIN# identify the vehicle as an F150.

[5] The loan identifies the Truck as an F250, and the VIN on the loan document does not match the VIN identified in later loan documents in which the Truck served as collateral. This discrepancy is due to the modification of the Truck.

repair, and the transmission needs to be replaced. It would be difficult to find a replacement transmission for the Truck because it is an obsolete item.

Because the Truck came from Spokane, Washington and weathered the northwest climate, it has some rust on the exterior. The exterior of the Truck could use a full paint job, although pictures of the Truck indicate that the exterior is in fair condition. *See* Exhibit 16. Pictures of the Truck's interior show some cracking in the upholstery of the front bench seat, but for the most part, the interior looks to be in fairly good condition considering its age. The Debtor currently keeps the Truck at his home in Gilbert, Arizona. The Debtor considers the Truck a daily driver, though he agrees it is a "classic" because of its age. In the Debtor's opinion, the Truck is worth only $600 because of the need for repairs.

Because the Truck was modified from its original manufactured form, it is difficult to find comparable NADA values. The Truck has a Super Cab, but Ford did not manufacture an F350 in 1978 that had a Super Cab. The NADA retail values for a 1978 Ford F350 (no Super Cab) as of July 11, 2018 are: 1) low retail value of $2,375; 2) average retail value of $5,800; and 3) high retail value of $8,050. *See* Exhibit 2.[6] The NADA retail values for a 1978 Ford 350 1 ton Styleside Crew Cab with four wheel drive and a 351 V8 engine as of January 17, 2019 are: 1) low retail value of $3,525; 2) average retail value of $8,025; and 3) high retail value of $10,775, with a list price of $6,100. *See* Exhibit 3. The NADA values for a 1979 Ford F350

---

[6] "Low retail value" means the value of the vehicle "in mechanically functional condition, needing only minor reconditioning" with exterior paint, trim, and interior showing normal wear and tear; it does not reflect value for a "parts car" or a "non-running vehicle." Exhibit 3. The low retail values reflected on an NADA value also apply to vehicles with a "deteriorated restoration or a very poor amateur restoration." *Id.* If a vehicle is treated as a "daily driver" rather than a "classic vehicle," the NADA report recommends using the low retail value. *Id.* "Average Retail Value" means a vehicle in good overall condition, and includes older restorations and well[maintained original vehicles that are completely operable. *Id.* "High Retail Value" means a vehicle in excellent overall condition, and includes completely restored vehicles and extremely well-maintained original vehicles showing very minimal wear. *Id.*

-4-

range from a low retail value of $4,275 to a high value of $21,800. *See* Exhibit B. NADA values for a 1978 Ford F250 ¾ Ton Flareside as of August 6, 2014 range from a low retail value of $1,775 to a high retail value of $7,125 with a list price of $5,087. *See* Exhibit 6.[7]

Linda Moya, collections manager for the Credit Union, with eighteen years of experience testified on behalf of the Credit Union. She is familiar with working on old cars and has assisted in rebuilding engines, transmissions, and replacing clutches and brakes. If the Credit Union repossessed the Truck, the Credit Union would perform the recommended repairs and sell the Truck. A representative of the Credit Union has not recently inspected the Truck in person because the Truck is no longer located in New Mexico. In Ms. Moya's opinion, this type of truck is in high demand and would be easy for the Credit Union to sell. In her opinion, the Truck is worth $9,000 after making the $1,746.50 of recommended repairs.

The Court finds that the value of the Truck is $5,000 for purposes of redemption.

DISCUSSION

Section 722 governs redemption. Under that section, an individual chapter 7 debtor may redeem exempt personal property intended for personal or family use subject to a lien securing dischargeable consumer debt by paying the lienholder at the time of redemption the amount of

---

[7] The following table compares the NADA valuation estimates admitted into evidence at the final hearing:

| Exhibit | Vehicle | Valuation Date | Low Retail Value | Average Retail Value | High Retail Value |
|---|---|---|---|---|---|
| B | 1979 Ford F350 Custom 1 Ton Super Cab Pickup | 04/19/18 | $4,275 | $14,950 | $21,800 |
| 2 | 1978 Ford F350 1 Ton Styleside | 07/11/18 | $2,375 | $5,800 | $8,050 |
| 3 | 1978 F350 1 Ton Styleside Crew Cab 351 V8 Engine; 4 wheel drive | 01/17/19 | $3,525 | $8,025 | $10,775 |
| 6 | 1978 F250 ¾ Ton Flareside | 08/06/14 | $1,775 | $4,900 | $7,125 |

the lienholder's secured claim in full. *See* 11 U.S.C. § 722.[8] *See also* 6 Collier on Bankruptcy ¶ 722.01 (Richard Levin & Henry J. Sommer, eds., 16th ed.) ("Section 722 of the Bankruptcy Code provides that an individual debtor may redeem consumer goods from a lien securing a dischargeable consumer debt, if the property is exempted under section 522 or has been abandoned under section 544, by paying the lienholder the amount of the allowed claim secured by the lien, i.e., the value of the lienholder's collateral if he or she is undersecured."). Redemption under 11 U.S.C. § 722 thus requires the following: 1) the property must be exempted under 11 U.S.C. § 522 or abandoned under 11 U.S.C. § 544; 2) the property must be used primarily for personal, family, or household use; 3) the debt must be consumer debt; 4) the redemption amount must be equal to the value of the creditor's secured claim; and 5) the debtor must pay the value of the secured claim in full at the time of redemption. 11 U.S.C. § 722.

*The first three requirements*

The first three redemption requirements have been satisfied. First, the Debtors claimed an exemption in the Truck on Schedule C. Second, the Truck will be used primarily for personal, family, or household use. Although Mr. Maynes testified that he wants to redeem the Truck for the benefit of his son rather than for himself, such use fits within the requirements for redemption. Mr. Maynes' son is a family member, and the Truck will be used primarily for personal, rather than business purposes. *See Cypher Chiropractic Center v. Runski (In re Runski)*, 102 F.3d 744, 747 (4th Cir. 1996) ("[P]roperty used for business purposes or with a

---

[8] Section 722 provides:
> An individual debtor may, whether or not the debtor has waived the right to redeem under this section, redeem tangible personal property intended primarily for personal, family, or household use, from a lien securing a dischargeable consumer debt, if such property is exempted under section 522 of this title or has been abandoned under section 554 of this title, by paying the holder of such lien the amount of the allowed secured claim of such holder that is secured by such lien in full at the time of redemption.

11 U.S.C. § 722.

-6-

Case 18-11609-j7   Doc 35   Filed 04/18/19   Entered 04/18/19 16:17:47 Page 6 of 13

profit motive is not 'property intended primarily for personal . . . use' within the meaning of § 722."). Third, the debt secured by the Truck is consumer debt. "Consumer debt" is defined in the Bankruptcy Code as "debt incurred by an individual primarily for a personal, family or household purpose." 11 U.S.C. § 101(8). Because the Debtors acquired the Truck for their personal use, this redemption requirement has also been satisfied.

*Valuation*

The fourth requirement for redemption is payment of the redemption amount, which is equal to the value of the creditor's allowed secured claim. Redemption allows a debtor "to 'strip off' a portion of a claim against exempt or abandoned property, paying the lender only the portion of its claim secured by the value of the collateral." *In re Weber*, 332 B.R. 432, 436 (B.A.P. 10th Cir. 2005).

Under 11 U.S.C. § 506(a), the value of a creditor's interest in the collateral "shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property." 11 U.S.C. § 506(a)(1). For individual chapter 7 debtors, the value of personal property for purposes of determining the secured portion of a creditor's claim is "determined based on the replacement value of such property as of the date of the fling of the petition without deduction for costs of sale or marketing." 11 U.S.C. § 506(a)(2). For personal property acquired for personal, family, or household use, "replacement value" is further defined to "mean the price a retail merchant would charge for property of that kind considering the age and condition of the property at the time the value is determined." 11 U.S.C. § 506(a)(2).

Thus, for redemption purposes, valuation has two components: 1) the appropriate measure of value; and 2) the relevant time for fixing value. The appropriate measure of value for redemption purposes must take into account the condition of the collateral; it "is not simply the

-7-

Case 18-11609-j7    Doc 35    Filed 04/18/19    Entered 04/18/19 16:17:47    Page 7 of 13

retail value stated in an industry guide." 6 Collier on Bankruptcy ¶ 722.05[1] (Richard Levin & Henry J. Sommer, eds., 16th ed.); 11 U.S.C. § 506(a)(2). And under 11 U.S.C. § 506(a)(2), the replacement value of property acquired for personal, family, or household use, is the price at which a retail merchant would sell the property given the age and condition of the property. In other words, the redemption value is the appropriate retail value, taking into account the age and condition of the property.

Courts disagree whether the value of collateral should be determined pursuant to § 506(a)(2) for purposes of redemption as of the petition date or as of the date of the redemption hearing.[9] *Compare In re Morales*, 387 B.R. 36 (Bankr. C.D. Cal. 2008) (concluding that § 506(a) fixes the petition date as the single, determinative valuation date such that the redemption value of personal property under § 722 must be determined as of the petition date) *with In re Podnar*, 307 B.R. 667, 672 (Bankr. W.D. Mo. 2003) ("[T]he appropriate date for valuing collateral is the date the motion for redemption is filed or, if the redemption is contested, the date of the hearing on redemption.") (citation omitted). The Court is persuaded that the language of 11 U.S.C. § 506(a)(2) requires valuation as of the petition date.

Section 506(a)(2) consists of two sentences. The first sentence applies to Chapter 7 and Chapter 13 cases in which the debtor is an individual and provides for valuation of personal property securing an allowed secured claim "based on the replacement value of such property *as of the date of the filing of the petition* without deduction for the costs of sale or marketing." 11 U.S.C. § 506(a)(2) (emphasis added). The second sentence applies to "property acquired for

---

[9] Section 506(a)(2) was added to the Bankruptcy Code by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). It represents only one of many ambiguities introduced into the Bankruptcy Code by BAPCPA. *See In re Donald*, 343 B.R. 524, 529 (Bankr. E.D.N.C. 2006) ("The [BAPCPA] amendments are confusing, overlapping, and sometimes self-contradictory.").

personal, family, or household purposes" and further defines "replacement value" as "the price a retail merchant would charge for property of that kind considering the age and condition of the property *at the time value is determined.*" *Id.* (emphasis added). As the Court explained in *Morales*, the question is whether the second sentence in 11 U.S.C. § 506(a)(2) requiring valuation "at the time value is determined" changes the valuation date when property is valued under the second sentence of 11 U.S.C. § 506(a)(2). *Morales* , 387 B.R. at 43.

One way to read the statutory language of 11 U.S.C. § 506(a)(2) is that its two sentences fix different valuation dates. Under that construction, the first sentence fixes the petition date as the valuation date for personal property *not* acquired for personal, family, or household purposes, and the second sentence fixes the time of the valuation hearing as the valuation date for personal property that *is* acquired for personal, family, or household purposes. *See In re Cook*, 415 B.R. 529, 533 (Bankr. D. Kan. 2009) (disagreeing with *Morales* so as not to "render the last few words of the second sentence of § 506(a)(2) superfluous.").[10]

In this Court's view, the better construction of § 506(a)(2) is that it fixes the petition date as the valuation date regardless of whether the property is acquired for personal, family, or household purposes. This construction does not render superfluous the clause in the second

---

[10] Other secondary sources agree that the date of the valuation hearing is the correct time to fix collateral value. As noted by Judge Keith M. Lundin:

> Logically, if the drafters intended property acquired for personal, family or household purposes to be valued at the petition date, they would have used the same language in the second sentence as in the first sentence of new § 506(a)(2), or said nothing at all about timing in the second sentence. A convincing argument emerges that property acquired for personal, family or household purposes is valued as of whatever time value is determined and all other personal property is valued at the petition.

5 Keith M. Lundin, *Chapter 13 Bankruptcy* § 450.1 (3d ed. 2000 & Supp. 2007-1). *See also* 6 Collier on Bankruptcy ¶ 722.05[1] (Richard Levin & Henry J. Sommer, eds. 16th ed.) ("Most courts have held that, for purposes of redemption, valuation should ordinarily be as of the date of the redemption proceeding.").

sentence of § 506(a)(2), "at the time value is determined," because that language is used to refer back to the petition date stated in the first sentence as the time value is determined. *See Morales,* 387 B.R. at 44 ("[T]his interpretation reads the clause as referring back to the petition date standard of the first sentence."). Further, if "at the time value is determined" is not read to refer back to the petition date petition date standard of the first sentence, the language does not provide meaningful guidance to determine the relevant valuation date. It could mean the time a valuation motion is filed, the time a valuation hearing is held, or even under an illogical but literal reading, the time the Court issues a decision determining value. Construing "at the time value is determined" in the second sentence to mean the "date of the valuation hearing" reads additional words into the statute that are neither present nor implicit in the statutory language.

The Court agrees with the reasoning of *Morales* and concludes that the appropriate time to value personal property for redemption purposes is the petition date, not the date of the valuation hearing. By using the petition date as the appropriate valuation date, the creditor does not bear the risk of a post-petition decrease in the value of its collateral when a debtor seeks to redeem personal property. Nor does the creditor, in the rare instance of a post-petition increase in the value of personal property serving as collateral, reap the benefit of such increased value by requiring a debtor to pay a higher amount to redeem the property. The petition date is the date as of which retail value is determined for redemption purposes.

The Court will next consider the evidence to determine the redemption value of the Truck as of the petition date. It is appropriate to use the NADA retail values as a starting point for determining the vehicle's redemption value. *Morales,* 387 B.R. at 45 ("[A]bsent unusual circumstances, the retail value should be calculated by adjusting the Kelley Blue Book or N.A.D.A. Guide retail value for a like vehicle by a reasonable amount in light of any additional

Case 18-11609-j7    Doc 35    Filed 04/18/19    Entered 04/18/19 16:17:47 Page 10 of 13

evidence presented regarding the condition of the vehicle and any other relevant factors.") (citations omitted). *Cf. In re Eddins*, 355 B.R. 849, 852 (Bankr. W.D. Okla. 2006) (concluding that the NADA retail value is the starting point to determine "replacement value" under § 506(a)(2)).

None of the NADA values admitted into evidence are completely comparable to the Truck. The 1979 Ford F350 (Exhibit B), which ranges from a low retail value of $4,275 to a high retail value of $21,800, is the wrong model year. The 1978 F250 3/4/Ton Flareside (Exhibit 6), which ranges from a low retail value of $1,775 to a high retail value of $7,125, is the correct year, but the wrong model, and has a valuation date of nearly four years before the Debtor filed his bankruptcy petition.

The two NADA valuations for a 1978 F350 1Ton Styleside Crew Cab (Exhibits 2 and 3) are the most comparable to the Truck, although the body style of the 1978 F350 1 Ton Styleside Crew Cab in the NADA valuations does not match the Truck, which has a Super Cab. The only NADA valuation admitted into evidence that provides a value of a similar truck at or near the petition date has a suggested low retail value of $2,375 and an average retail value of $5,800. *See* Exhibit 2. Although Mr. Maynes stated that in his opinion the Truck is only worth $600, his estimate is based in part on his opinion that the Truck needs a new transmission. There is no corroborating evidence to support that conclusion. The estimated cost of repairs to put the Truck in good mechanical condition made by San Tan of Gilbert, Arizona did not include a new transmission. *See* Exhibit 16.

"As the party seeking redemption, the Debtor[s] 'bear the burden of proving the appropriate redemption value by a preponderance of the evidence.'" *In re Perales*, No.11-8045, 2012 WL 902790, at *3 (B.A.P. 6th Cir. Mar. 12, 2012) (quoting *In re Herrera*, 454 B.R. 559,

561 (Bankr. E.D.N.Y. 2011)). *See also Morales*, 387 B.R. at 45 ("The burden in proving the reasonableness of any deviation from the guide retail value rests with the debtor because the debtor has the best access to information about the condition of the vehicle.") (citations omitted). After careful consideration of the evidence, using the NADA retail values as the starting point, and taking into consideration the age and condition of the Truck including the need for repairs, the Court finds and concludes that the replacement value of the Truck for redemption purposes is $5,000.

*Payment*

The statute requires payment " in full at the time of redemption." 11 U.S.C. § 722. Debtors have requested 60 days from the date of entry of the order granting their motion to redeem within which to pay the redemption amount. The Court has some discretion to allow a debtor additional time within which to pay the redemption amount, provided the redemption amount is paid in full in one lump sum. *See* 6 Collier on Bankruptcy ¶ 722.05[2] (Richard Levin & Henry J. Sommer, eds., 16th ed.) ("[T]he court may give the debtor additional time to accumulate the redemption amount, but it must ultimately be paid in one full payment to the creditor."). Section 521 requires debtors to file a statement of intention within 30 days of the petition date indicating whether the debtors intend to surrender property, retain and redeem property, or reaffirm the debt secured by such property, and, generally requires the debtor to perform that intention within 30 days after the first date set for the creditor's meeting. 11 U.S.C. § 521(a)(2)(A) and (B). Consistent with the 30-day periods contemplated by 11 U.S.C. § 521, the Court, in its discretion, determines that 30 days from the date of entry of the order authorizing redemption is a reasonable period within which the Debtors must pay the lump sum redemption amount in full.

CONCLUSION

Based on the foregoing, the Court will deny the Motion to Redeem, with leave for the Debtors to redeem the Truck for $5,000 within thirty days of the date of entry of the Court's order. The Court will enter a separate order consistent with this Memorandum Opinion.

_____
ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket: April 18, 2019

COPY TO:

Ronald E Holmes
Attorney for Debtor
Davis Miles McGuire Gardner, PLLC
320 Gold SW, Suite 1111
Albuquerque, NM 87102

Ryan Kluthe
Attorney for Credit Union
1212 Pennsylvania
Albuquerque, NM 87110